UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

ZELMA DUDLEY,                                        1:15-CV-08821-JMF

                              Plaintiff,            **DEFENDANT'S DECLARATION
                                                    IN OPPOSITION TO
-against-                                           PLAINTIFF'S MOTION FOR
                                                    SUMMARY JUDGMENT**

Hanzon Homecare Services, Inc. et al,

                              Defendants.

------------------------------------------------------------------x

MELSADA MORRISON, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of
perjury that the following is true and correct:[1]

1. I am the Defendant in the above-captioned matter and I respectfully submit my
   declaration in opposition to Plaintiff's motion for summary judgment.

2. I am the president and sole owner Mel's Quality Care Services at 2349 Ellis Ave., Bronx,
   NY, which provides aides to care for the elderly. In 2015 the name of the company was
   changed to Hanzon Homecare Services, Inc ("Hanzon"). I received a high school diploma
   in Jamaica. When I moved to the United States, I worked as a counselor for the mentally
   challenged. I began working as a home aide for the elderly after developing relationships
   with nurses and social workers who referred me to families who needed a companion for
   their elderly relatives. After working as a home aide for several years, I decided to create
   my own company (Hanzon f.k.a. Mel's Quality Care).

3. Acting in my corporate capacity, I offered Plaintiff the opportunity to sign a wage
   contract with Hanzon in August 2013. However, I did not have any placements for her at
   that time and she did not begin performing work for Hanzon until late November 2013.

---

[1]     This document was prepared with the assistance of the New York Legal Assistance
Group Legal Clinic for Pro Se Litigants in the SDNY.

At that time Plaintiff began serving as a live-in companion for an elderly client who did

not need 24 hour care but whose family wanted her to have a live-in companion.  Her

prior aides were terminated in November 2013.  I tried placing two other aides with the

client in early November but she did not like them.  Then I asked Plaintiff to work with

her.  Her pay for approximately the first four weeks she worked was in cash because I

was not sure the client would like her.  When the client approved of Plaintiff, she was

entered into the ADP payroll book with a start date of December 23, 2013.  Plaintiff's

first pay check was issued on January 7, 2014 on behalf of Hanzon.  Attached hereto as

**Exhibit A** is a true and correct copy of Plaintiff's payroll summary and pay stubs for her

employment with Hanzon.

4.   Plaintiff split the seven-days-per-week care of the client with another aide, Donna

Simpson.  Plaintiff usually worked five days per week – usually beginning work Monday

morning, and working Monday, Tuesday, Wednesday, Thursday and Friday and going

home Saturday morning at 9:00 am.  Ms. Simpson usually worked two days per week –

usually beginning work Saturday morning at 9:00 am and leaving Monday morning at

9:00 am.  Attached hereto as **Exhibit B** is a true and correct copy of Donna Simpson's

affidavit dated February 9, 2016 describing the split of the work days between herself and

Plaintiff and the client's behavior and schedule.  Plaintiff's and Simpson's duties

included preparing meals for the client, assisting her with showering and dressing,

washing the client's clothes but not bed linens, and accompanying her on walks or while

watching television.  I told Plaintiff that I would be reducing the number of days she

worked per week from five to four after the client's doctors and dietician noticed in May

2015 that the client was losing weight.  Plaintiff became angry and verbally abusive.  I

suspended Plaintiff and ultimately terminated her employment with Hanzon in May 2015 for cause (neglect and verbal abuse of the client).  Another aide, Patricia Lewis, began working with the client several days per week on days that Ms. Simpson did not work. Attached hereto as **Exhibit C** is a true and correct copy of Patricia Lewis's affidavit dated February 10, 2016 describing the client's behavior and schedule.

5. Beginning in 2006, I worked as an aide for an elderly woman who lived in the condominium complex where client at issue in this case lived. I interacted with her for several years before a live-in companion for her was hired by her family. Due to her deteriorating health, her family had insisted that a companion be hired to live with her or that she move into assisted living. The client chose a live-in companion and asked her family to hire an aide.

6. The client was independent about preparing for bed each night. She watched TV for a bit every evening.  Plaintiff often told me that Plaintiff continued watching TV while the client walked herself to bed.

7. I routinely called the house phone to check in with Plaintiff.  Based on my regular calls to the client's home to check-in, I know that on Wednesdays and Sundays client's family took her out and that Plaintiff had the option to go with them or stay behind.  The Sunday outings typically lasted four hours in the middle of the day; the Wednesday outings typically lasted three hours in the middle of the day.  On days when the client did not go out, Plaintiff was free to plan her breaks according to her own discretion such as while the client was napping, watching TV, or reading.  Plaintiff could also leave the client alone for brief periods (1-2 hours) to go out, for example to the store.  Attached hereto as **Exhibit D** is a true and correct copy of Donna Simpson's affidavit dated February 3,

2017 describing the free time she had and the breaks she took during a typical work week. Attached hereto as **Exhibit E** is a true and correct copy of Patricia Lewis' affidavit dated February 3, 2017 describing the free time she had and the breaks she took during a typical work week. I believe the free time Ms. Simpson and Ms. Lewis had and the breaks they took to be comparable to the free time and breaks available to Plaintiff.

8. During periods when she was on duty, Plaintiff slept on a pull-out sofa bed in a separate room. Plaintiff was provided with a log book in which she (and the other aides who worked with the client) could make note of whether the client ate and slept well. For many of the days during which Plaintiff worked with the client, there was a note that the client slept well. There was a notation that the client did not sleep well on only two occasions. Attached hereto as **Exhibit F** is a true and correct copy of the log book. I depended on the logbook having correct notations so that I could brief the client's family and doctors. There are some pages missing. Those pages were missing at the time Plaintiff filed her suit. The aides removed pages from the log book to use as scrap paper for telephone messages and grocery lists. I never received a complaint from Plaintiff that Plaintiff was not sleeping during the night or that she was not able to take appropriate breaks until I received notice of Plaintiff's lawsuit against me in September 2015.

9. The client had a housekeeper who came every two weeks to perform general house cleaning and to wash the linens for her bed. Plaintiff was only responsible for light chores incidental to caring for the client: cleaning up after meals, like washing dishes and cookware post-meals, and washing the client's clothes.

10. Plaintiff was paid $130 per day. Plaintiff was provided with a Notice and Acknowledgement of Pay Rate and Payday Under Section 195.1 of the New York State

Labor Law and had agreed to a daily rate of pay.  Plaintiff also signed a Notice of Employee Rights – New York City Earned Sick Time Act. Attached hereto as **Exhibit G** is a true and correct copy of Plaintiff's signed Notice and Acknowledgement of Pay Rate and Payday and signed Notice of Employee Rights – New York City Earned Sick Time Act.

11. I took affirmative steps to confirm that Hanzon's pay practices complied with the FLSA and New York Labor Law.  I asked my son, a Hanzon employee, to call the New York State Labor Board to understand what Hanzon needed to do to comply with the law.  In addition, Hanzon used payroll forms and notices from the New York State Department of Labor's website, submitted to annual audits by the New York State Department of Labor, and employed a well-regarded professional payroll company. During the New York State Department of Labor audit each year, an auditor reviewed all of the paperwork that they requested Hanzon provide – e.g., bank account statements and quarterly payroll statements.  I believed that the auditors would have raised a concern if Hanzon's pay notices and pay stubs were legally deficient.

12. I reasonably believed that Hanzon's practices for paying its employees complied with governing law, and that the wage notices and pay stubs provided to employees complied with governing law.  I reasonably believed that Hanzon did not need needed to provide an hourly or overtime pay rate on the form because Plaintiff had agreed to a daily rate of pay.

13. I have used ADP as Hanzon's payroll service provider since I started the company. All employees complete a timesheet each pay period and I provide that information to ADP, which provides employees, including Plaintiff, with direct deposit. Pay stubs are provided by ADP, which I give to Hanzon's employees, including Plaintiff. ADP is a professional

payroll service company. Hanzon used ADP in order to ensure Hanzon complied with payroll requirements, such as ensuring that proper amounts were deducted from employees' paychecks for taxes, social security, etc. At no point did ADP indicate to Hanzon that it needed to provide information on an hourly pay rate or overtime pay rate or to provide the number of hours worked. When New York's paid sick time act was passed, ADP sent Hanzon a notice about the change in the law. I believed that ADP would have notified Hanzon if its pay stubs were routinely missing legally required information.

14. Plaintiff did not work a total of more than five days in any week or more than ten days in any bi-weekly payroll period. Plaintiff received holiday pay, vacation pay, and bonus pay four times during the course of her employment, on each occasion in 2014. This is recorded as an extra day when it is inputted on the payroll system – e.g., if Plaintiff worked five days in one week and received holiday pay, an additional day would be inputted on the timesheet to account for the holiday pay even though the client was at work only five days. She received holiday pay on February 4, 2014 for New Year's Day and Christmas Day. She received a bonus of one pay day on March 18, 2014. She received holiday pay on September 16, 2014 for Labor Day. (*See* Exhibit A). There were therefore four weeks in 2014 when the payroll service recorded Plaintiff as having worked more than five days when in fact she worked only five days.

15. I worked closely with the client, often alongside Plaintiff, Ms Lewis and Ms. Simpson. I took the client to dialysis from April 2014 through October 2015. The client went to dialysis on Tuesdays, Thursdays, and Saturdays every week. I picked the client up at 10:00 am on each of those days and routinely returned the client to the client's residence

at approximately 5:00 pm on each of those days. We never returned to the client's residence before 4:30pm. Accompanying the client to dialysis appointments on days Plaintiff worked (Tuesdays and Thursdays) was not required of Plaintiff and she usually did not come. From my recollection, Plaintiff only came along twice to dialysis appointments. Since there was no place to wait during dialysis, on those two occasions, I dropped Plaintiff at a bus stop after the client was dropped off at dialysis. I called Plaintiff when we were headed back to the client's residence so she could meet us there. So, during this period, Plaintiff routinely had 7 hours to herself on Tuesdays and Thursdays, in addition to any other breaks she took.

Executed: February 6, 2017

MELSADA MORRISON



Welcome, Melseda Norrison

## Pay Stubs - Velma Dudley

Check dates from 07/01/2013 to 06/01/2015   Find

| Check Date | Check Number | Total Paid | Net Pay |
|---|---|---|---|
| 05/26/2015 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 05/12/2015 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 04/14/2015 | Direct Deposit | 1,170.00 | 1,170.00 View Pay Stub |
| 03/31/2015 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 03/17/2015 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 03/03/2015 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 02/17/2015 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 02/03/2015 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 01/20/2015 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 01/06/2015 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 12/23/2014 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 12/08/2014 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 11/25/2014 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 11/10/2014 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 10/28/2014 | Direct Deposit | 1,200.00 | 1,200.00 View Pay Stub |
| 10/14/2014 | Direct Deposit | 650.00 | 650.00 View Pay Stub |
| 09/30/2014 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 09/16/2014 | Direct Deposit | 1,430.00 | 1,430.00 View Pay Stub |
| 09/02/2014 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 08/19/2014 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 08/05/2014 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 07/22/2014 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 07/08/2014 | Direct Deposit | 1,170.00 | 1,170.00 View Pay Stub |
| 06/24/2014 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 06/10/2014 | Direct Deposit | 1,170.00 | 1,170.00 View Pay Stub |
| 05/27/2014 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 04/29/2014 | Direct Deposit | 1,040.00 | 1,040.00 View Pay Stub |
| 04/15/2014 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 04/01/2014 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |
| 03/18/2014 | Direct Deposit | 1,430.00 | 1,430.00 View Pay Stub |
| 03/04/2014 | Direct Deposit | 1,040.00 | 1,040.00 View Pay Stub |
| 18/2014 | Direct Deposit | 1,300.00 | 1,300.00 View Pay Stub |

### Personal Information
- 1099 Info
- 1099 Work Contact Info
- Terminate Contractor

### Payroll
- 1099 Payroll Info
- 1099 Deductions
- 1099 Direct Deposit
- 1099 Pay Stubs
- 1099 Employee Access

Client ID: 2014R125 RF/OND   Feedback   Privacy   Terms of Use   Contact Us   © 2006 - 2017 ADP, LLC. All Rights Reserved

| 02/04/2014 | Direct Deposit | 1,560.00 | 1,560.00 | View Pay Stub |
| 01/21/2014 | Direct Deposit | 1,300.00 | 1,300.00 | View Pay Stub |
| 01/07/2014 | 10123 | 650.00 | 650.00 | View Pay Stub |

© 2006 - 2017 ADP, LLC. All Rights Reserved

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ZELMA DUDLEY, *individually and on behalf of all others similarly situated,*

                                          *Plaintiffs,*

      v.

HANZON HOMECARE SERVICES, INC. f/k/a
MEL'S QUALITY CARE SERVICES, INC. and
MELSADA MORRISON,

                                      *Defendants.*

RECEIVED
SDNY DOCKET UNIT
2017 FEB -7  AM II: 33

**AFFIDAVIT**

Civil Action No. 15-cv-08821 (JMF) (REL)

Donna Simpson, being duly sworn, deposes and says:

1.    I reside at 117 Orchard Street, Mount Vernon, New York 10552, and give this affidavit in support of the defense of Mel's Quality Homecare Services, Inc. ("Mel's") and Melsada Morrison, defendants in this lawsuit.

2.    I worked for Mel's from 2013 until October 17, 2015 as a home health care aide, though I did not work during the summer of 2015.  I worked as a live-in with different clients of Mel's and worked with Mrs. Shirley Rosenberg from November, 2013 through October 17th of last year.

3.    As a live-in aide, I prepared meals for Mrs. Rosenberg, and was a companion for her, watching T.V. and talking with her.  I slept in the T.V. room adjacent to her bedroom on a pull-out sofa bed.

4.    I was paid a flat rate of $120 per day and lived in the residence for that time, though we went outside her room to walk the hallway or outside by the pool if the weather was



PLAINTIFF'S EXHIBIT
14
10/19/16

agreeable, and occasionally accompanied her with her family when they would visit and take Mrs. Rosenberg to lunch or dinner.

5.    I initially worked Saturdays and Sundays, but later changed the schedule so that I worked Fridays, Saturdays and Sundays, beginning in September, 2014. Mrs. Rosenberg was generally self-sufficient. She would go to bed by herself and get herself up in the morning, but I would assist with showing and changing sets of new clothes. She generally went to bed at 9:00 p.m. and arose the following morning at 10:30 a.m., except when she went to dialysis on Tuesday, Thursday and Saturday, when she was awakened at 8:00 a.m. She would get up to use the bathroom by herself during the night, and did so on her own. I did not have to get up to assist her to do so.

6.    Mrs. Rosenberg ate and slept well. She would generally get up once or twice after she went to bed to use the bathroom, and sometimes I would hear her. I am sure I got at least 8 hours of sleep when working for Mrs. Rosenberg, and 5 hours of uninterrupted sleep during that time.

7.    There was a logbook for the aides working for Mrs. Rosenberg. We were told by Mel Morrison to write in the book anything that might be important for Mel and the other aides to know concerning Mrs. Rosenberg's behavior. Entry of information was not mandatory, but if we thought it was helpful we were told to make an entry. These included if she was confused, did or did not have a bowel movement, was in pain or was not eating or sleeping well.

8.    I enjoyed working with Ms. Rosenberg and her family. She was a sweet person who was not needy or demanding in any way. She took care of her own bathroom functions, and I did not assist her in this regard.

2

9.    I have read the foregoing 8 paragraphs and they are true and accurate to the best of my own personal knowledge.

_____
Donna Simpson

STATE OF NEW YORK    )
                                                ss.:
COUNTY OF NEW YORK)

Sworn to before me this 10th day
of February, 2016

_____
Notary Public

BASIL MOHABIR
NOTARY PUBLIC-STATE OF NEW YORK
No. 03MO4997856
Qualified in Bronx County
My Commission Expires 06/15/2018

3

RECEIVED
SDNY DOCKET UNIT
2017 FEB -7 AM 11: 33

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ZELMA DUDLEY, *individually and on behalf of all
others similarly situated,*

                                     *Plaintiffs,*

        **v.**

HANZON HOMECARE SERVICES, INC. f/k/a
MEL'S QUALITY CARE SERVICES, INC. and
MELSADA MORRISON,

                                  *Defendants.*

**AFFIDAVIT**

Civil Action No. 15-cv-08821 (JMF) (REL)

Patricia Lewis, being duly sworn, deposes and says:

1.    I reside at 1114 Arnold Avenue, Bronx, New York 10469, and give this affidavit in support of the defense of Mel's Quality Homecare Services, Inc. ("Mel's") and Melsada Morrison, defendants in this lawsuit.

2.    I worked for Mel's from 2010 to earlier this year as a home health care aide. I worked as a live-in with different clients of Mel's and worked with Mrs. Shirley Rosenberg from June, 2015 through October 17 of last year.

3.    As a live-in aide, I prepared meals for Mrs. Rosenberg, and was a companion for her, watching T.V. and talking with her. I slept in the T.V. room adjacent to her bedroom on a pull-out sofa bed.

4.    I was paid a flat rate of $130 per day and lived in the residence for that time, though we went outside her room to walk the hallway or outside by the pool if the weather was agreeable, and occasionally accompanied her with her family when they would visit and take Mrs. Rosenberg to lunch or dinner.

PLAINTIFF'S EXHIBIT
15

5.      I worked Wednesdays and Thursdays and sometimes on the weekend.  Mrs.
Rosenberg was generally self-sufficient.  She would go to bed by herself and get herself up in the
morning.  She generally went to bed at 9:00 p.m. and arose the following morning at 10:30 a.m.,
except when she went to dialysis on Tuesday, Thursday and Saturday, when she was awakened at
8:00 a.m.  She would get up to use the bathroom by herself during the night, and did so on her
own.  I did not have to get up to assist her to do so.

6.      Mrs. Rosenberg ate and slept well.  She would generally get up once or twice
after she went to bed to use the bathroom, and sometimes I would hear her.  I am sure I got at
least 8 hours of sleep when working for Mrs. Rosenberg, and 5 hours of uninterrupted sleep
during that time.

7.      There was a logbook for the aides working for Mrs. Rosenberg.  We were told by
Mel Morrison to write in the book anything that might be important for Mel and the other aides to
know concerning Mrs. Rosenberg's behavior.  Entry of information was not mandatory, but if we
thought it was helpful we were told to make an entry.  These included if she was confused, did or
did not have a bowel movement, or was not eating or sleeping well.

8.      I enjoyed working with Ms. Rosenberg and her family.  She was a sweet person
who was not needy or demanding in any way.  She took care of her own bathroom functions, and
I did not assist her in this regard.

2

9.     I have read the foregoing 8 paragraphs and they are true and accurate to the best of my own personal knowledge.

_Patricia Lewis_
Patricia Lewis

2/9/16

MAURICE _____
Notary Public, State of New York
No. 02 _____
Qualified in Bronx County
Commission Expires ___. 11.

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ZELMA DUDLEY,

                        Plaintiffs,

—against—

HANZON HOMECARE SERVICES, Inc. et al.,

                        Defendant

---

RECEIVED
SDNY DOCKET **AFFIDAVIT**
2017 FEB -7  AM 11: 33

**AFFIDAVIT**

1:15-cv-08821-JMF

Donna Simpson, being duly sworn, deposes and says:

1.      I reside at 117 Orchard Street, Mount Vernon, New York, 10552, and give this affidavit in support of the defense of the defendants in this lawsuit.

2.      I worked for Mel's Quality Homecare Services, Inc. ("Mel's") (later called Hanzon) from 2013 until October 17, 2015 as a home health care aide, though I did not work during the summer of 2015. I worked as a live-in with different clients and worked with the client at issue in this case from November 2013 through October 17, 2015.  Plaintiff and I split the care of the client from November 2013 until Plaintiff was terminated in May 2015.

3.      On days when the client didn't have any appointments, the client was generally awake from 10:30 am until 9 pm. Sometimes the client slept later, and sometimes she went to bed earlier than 9pm. I would take a one hour lunch break and a one hour dinner break. I estimate that I generally worked 8.5 hours on days when the client didn't have any appointments (from when the client woke up at 10:30 am until she went to sleep at 9 pm, less one hour for a lunch break and one hour for a dinner break). Although, I also felt comfortable leaving the client alone for up to two hours, to complete errands or tasks, or simply to spend some time alone as well.

4.      I usually worked Saturdays and Sundays, although occasionally I would switch days with Ms. Dudley and work a different two days. I later changed the schedule so that I worked Fridays, Saturdays and Sundays.

5.      If I started work on Friday, I was expected to arrive at 9 am.  The client woke up late, around 10:30 am or later. Mrs. Morrison took the client to the hair dresser to get her nails and hair done. They were gone for three hours. I was not expected to come along, and I was free to do as I pleased during that time. I would take a one hour dinner break. The client generally went to bed around 9 pm.  I estimate that on Fridays, I worked 8 hours (from 9 am until 9 pm, less three hours while the client was out and one hour for a dinner break).

6.      On Saturdays after the client started having dialysis in April 2014, I woke the client up at 8 am to get her ready to go to dialysis if it was a week that I began working on Friday. If I began working on Saturday, the client would already be up when I arrived at 9 am. Mrs. Morrison picked her up at 10 am, and generally didn't return until 5 pm.  I was free during that time.  After the client returned from dialysis, I gave her dinner and then took my own dinner break for one hour.  The client generally went to bed around 9 pm or earlier because dialysis is exhausting.  I estimate that on Saturdays after the client started having dialysis when I began working on Friday, I worked 5 hours (from 8 am to 9 pm, less seven hours while the client was at dialysis and less one hour for a dinner break). This was 4 hours when I started my week on Saturday because I arrived an hour after the client had woken. Before she started having dialysis, I estimate that I worked 8.5 hours on Saturdays (from when the client woke up at 10:30 am until she went to sleep at 9 pm, less one hour for a lunch break and one hour for a dinner break). If I started work on Saturday before the client began dialysis, I estimate that I worked 10 hours on

Saturdays (from when I arrived at 9 am until she went to sleep at 9 pm, less one hour for a lunch break and one hour for a dinner break).

7.      On Sundays, the client woke up around 9:30 am.  The client's family would usually take her out to lunch and an outing for at least 4 hours.  Going along was optional.  Sometimes I chose to go along because I enjoyed spending time with the family, but when I went I had no work related responsibilities.  If I did not go, I was free to do as I chose.  After the client returned, I spent time with her and prepared her dinner.  After she ate I took my own dinner break for one hour.  The client generally went to bed around 9 pm.  I estimate that on Sundays, I worked 6.5 hours (from 9:30 am until 9 pm, less four hours while the client was out with her family and less an hour for my dinner break).

8.      I felt comfortable leaving the client alone for up to two hours, to complete errands or tasks, or simply to spend some time alone.

9.      I have read the forgoing 8 paragraphs and they are true and accurate to the best of my own personal knowledge.

State of New York      )
                       ) ss.:
County of New York     )

_____
**Donna Simpson**

Sworn to me this 3ʳᵈ Day
of   February   , 20 17

_____
Notary Public

AYMEN JABER
Notary Public, State of New York
No. 01JA6316958
Qualified in Kings County
Commission Expires December 22, 2018

3

UNITED STATES DISTRICT COURT
SOURTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY DOCKET UNIT
2017 FEB -7 AM 11: 33

**AFFIDAVIT**

| | |
|---|---|
| ZELMA DUDLEY, | |
| Plaintiffs, | |
| —against— | |
| HANZON HOMECARE SERVICES, Inc. et al., | |
| Defendant | |

1:15-cv-08821-JMF

Patricia Lewis, being duly sworn, deposes and says:

1.      I reside at 1414 Arnow Avenue, Bronx, New York 10469, and give this affidavit in support of the defense of the defendants in this lawsuit.

2.      I worked for Mel's Quality Homecare Services, Inc. (later called Hanzon) from 2010 until early 2016 as a home health care aide.  I worked as a live-in aide with different clients.  The client I worked with from June 2015 until October 17, 2015 was the same client whom Zelma Dudley had worked with.

3.      I worked Wednesdays, Thursdays, and sometimes on the weekend (Fridays, Saturdays and Sundays).

4.      On Wednesdays, I was expected to arrive around 9 am.  The client's daughter would usually take the client out to lunch and an outing for at least 3 hours.  Going along was optional. Sometimes I chose to go along because I enjoyed spending time with the family, but when I went I had no work related responsibilities.  If I did not go, I was free to do as I chose. After the client returned, I spent time with her and prepared her dinner.  After she ate, I took my own dinner break for one hour.  The client generally went to bed around 9 pm.  I estimate that on

8.      I felt comfortable leaving the client alone for up to 1.5 hours, to complete errands or tasks, or simply to spend some time alone.

9.      I have read the forgoing 8 paragraphs and they are true and accurate to the best of my own personal knowledge.

State of New York        )
                         ) ss.:
County of New York       )

_Patricia Lewis_
**Patricia Lewis**

Sworn to me this 3 Day
of FEBRUARY, 20 17

_____
Notary Public

DOREEN NGOMO EKOKO
Notary Public, State of New York
No. 01EK6258324
Qualified in Bronx County
Commission Expires March 26, 2020

3

Exhibit F
"Logbook"

Notice of Employee Rights – New York City Earned Sick Time Act

### Documentation

Your employer can require documentation from a licensed health care provider if you use more than three consecutive workdays as sick leave. The Paid Sick Leave Law prohibits employers from requiring the health care provider to specify the medical reason for sick leave. Disclosure may be required by other laws.

### Unused Sick Leave

Up to 40 hours of unused sick leave can be carried over to the next calendar year. However, your employer is only required to let you use up to 40 hours of sick leave per calendar year.

## You have a right to be free from retaliation from your employer for using sick leave.

Your employer cannot retaliate against you for:

- Requesting and using sick leave.
- Filing a complaint for alleged violations of the law with the New York City Department of Consumer Affairs
- Communicating with any person, including coworkers, about any violation of the law.
- Participating in a court proceeding regarding an alleged violation of the law.
- Informing another person of that person's potential rights.

Retaliation includes any threat, discipline, discharge, demotion, suspension, or reduction in your hours, or any other adverse employment action against you for exercising or attempting to exercise any right guaranteed under the law.

## You have a right to file a complaint.

You can file a complaint with the New York City Department of Consumer Affairs (DCA). To get the complaint form, go online to www.nyc.gov/paidsickleave or contact 311 (or 212.NEW.YORK outside NYC).

DCA will conduct an investigation and try to mediate your complaint. DCA will keep your identity confidential unless disclosure is necessary to conduct the investigation, mediate the complaint, or is required by law.

## Keep a copy of this notice and all documents that show your amount of sick leave and your sick leave accrual and use.

You have a right to be given this notice in English and, if available on the DCA website, your primary language. DCA has translated this notice to Spanish, Chinese, French-Creole, Italian, Korean, and Russian.

For more information, including Frequently Asked Questions, go to www.nyc.gov/paidsickleave or call 311 and ask for information about Paid Sick Leave.

## Employee Acknowledgment of Receipt

On the date specified below, I acknowledge receipt of this Notice of Employee Rights – New York City Earned Sick Leave Law form. I told my employer what my primary language is.

*Please check one:*

☑ I have been given this notice in English because it is my primary language.

☑ My primary language is _English_. I have been given this pay notice in English only because the DCA does not yet offer a notice form in my primary language.

| | | |
|---|---|---|
| _N Dudley_ | _VelMA Dudley_ | _5-29-14_ |
| **Employee Signature** | **Employee Name** *(Please Print)* | **Date** |

PLAINTIFF'S EXHIBIT
10
10/19/16

Revised March 28, 2014

<div style="text-align:center; border:1px solid black;">Hanzon Homecare Services, Inc.</div>

**MEMORANDUM**

TO:              **All Staff**

FROM:            **Mel's Quality Care Services, Inc.**

RE:              **Wage Theft Prevention Act**

The New York State Department of Labor passed a new law known as the Wage Theft Prevention Act which went into effect on April 9, 2011. This law requires companies to provide annual pay notices to all employees. This notice must include your rate(s) of pay, regular payday, how often you are paid and, if applicable, your overtime pay rate.

Your notice is attached. The law requires that you sign the bottom of the notice and return to your employer where it will be kept on file for six years. Please send to the attention of Melsada Morrison.

The law also requires that the notice be sent in the employee's primary language. If English is not your primary language, please let Mrs. Morrison know and we will send it to you in the language you request.

Should you have any questions, please do not hesitate to contact me.

PLAINTIFF'S EXHIBIT

9

10/19/16

**Notice and Acknowledgement of Pay Rate and Payday**
**Under Section 195.1 of the New York State Labor Law**
**Notice for Hourly Rate Employees**

**1. Employer Information**

Name: M&Q Quality Care Service Inc.

Doing Business As (DBA) Name(s):

FEIN (optional):

Physical Address: 2240 Ellis Ave
Bronx, NY 10462

Mailing Address: 2240 Ellis Ave
Bronx, NY 10462

Phone: (917) 445-1469

**2. Notice given:**
☐ At hiring
☒ On or before February 1st
☐ Before a change in pay rate(s), allowances claimed or payday

**3. Employee's rate of pay:** $15 – 132

**4. Allowances taken:**
☐ None
☐ Tips _____ per hour
☐ Meals _____ per meal
☐ Lodging _____
☐ Other _____

**5. Regular payday:**
Friday

**6. Pay is:**
☐ Weekly
☒ Bi-weekly
☐ Other

**7. Overtime Pay Rate:**

Check one:
☐ I have been given this pay notice in English only because the Department of Labor does not yet offer a pay notice form in my primary language.
☐ My primary language is _____. I have been given this pay notice in English only, because the Department of Labor does not yet offer a pay notice form in my primary language.

Velma Dudley
Employee Signature

Date 02/57/13

Natasha Morrison, M.Q.C.S. Owner
Preparer's Name and Title

The employee must receive a signed copy of this form. The employer must keep it. The original for 6 years.

Melsada Morrison
2349 Ellis Ave
Bronx, NY 10462

USM 5W
SDNY

RECEIVED
SDNY DOCKET UNIT
2017 FEB -7 AM 11: 33

Pro Se Intake
Room 200
500 PEARL